IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Fay E. Willis, et al.,                                   Case No. 3:08 CV 295

                          Plaintiffs,          MEMORANDUM OPINION
                                               AND ORDER

          -vs-
                                               JUDGE JACK ZOUHARY
Jeffery Michael Wallace, et al.,

                          Defendants.

### INTRODUCTION

Before the Court is Defendant Jeffery Wallace's Motion for Summary Judgment (Doc. No. 25).  Plaintiffs filed an Opposition (Doc. No. 39); Defendant filed a Reply (Doc. No. 40); and Plaintiffs filed a Sur-Reply (Doc. No. 46).

For the reasons below, Defendant's Motion for Summary Judgment is granted.

### BACKGROUND

Plaintiff Fay Willis was driving a rental car on February 6, 2005.  Plaintiff Dorothy Willis (Fay's mother) and Terrell Willis (Fay's son) were passengers in the car.  They were involved in a crash on Interstate 75 in Monroe County, Michigan with Defendant Jeffery Wallace.  Wallace attempted to change lanes and hit Plaintiffs.  After the initial collision, Plaintiffs were struck again by another car which was unable to stop safely.

All Plaintiffs were taken to Monroe Mercy Memorial Hospital where they were evaluated and released that same day.  Each Plaintiff received instructions to follow-up with their respective primary doctors.

**Fay Willis**

At the time of the accident Fay was 45 years old and generally in good health.

At the emergency room immediately after the accident, Fay complained of pain in her right ankle, back, head, and chest (Ex. A, p. 50).  She also said she bit her tongue and that she had pieces of glass removed from her body (*id.*).  X-rays taken in the emergency room indicated no broken bones (Ex. 19).  The emergency room physician diagnosed Fay with strains of the neck, low back, and right ankle (*id.*).  The emergency room physician also noted that tests of her cervical spine revealed degenerative changes resulting in bony bridging between the C4, C5, and C6 vertebrae (*id.*).

Shortly after the accident, on February 15, 2005, Fay saw her personal physician, Dr. McAlear.  Dr. McAlear noted Fay was using crutches and had pain in the lumbar region of her back (Ex. 6, p. 5).  Dr. McAlear also noted there was "some mild hematomas" (bruising) on Fay's scalp (*id.*).  He noted there "is significant myofascial spasm involving the lumbar spine bilaterally.  This is an ongoing issue that needs to be resolved as well" (*id.*).  Dr. McAlear was unable to explain the pain in Fay's left foot, noting it may be an occult fracture, but he expected it to get better (*id.*).

Fay saw Dr. McAlear again on February 23, 2005.  She reported she was experiencing daily headaches and lower back pain (Ex. 6, p. 4).  Dr. McAlear noted Fay appeared to be suffering from a "whiplash type injury" and gave her a prescription for the pain (*id.*).

Dr. McAlear recommended Fay see Dr. Padanilam, an orthopedist, for further investigation of her right ankle and the pain in her left foot.  On March 14, 2005, Dr. Padanilam took x-rays of

Fay's ankles and concluded they were not fractured and that the stability of both her ankles was good (Ex. 7, p. 1). Dr. Padanilam found Fay had severe Achilles tendonitis in her right foot (*id.*). Fay did not engage in physical therapy, did not require surgery, and is not currently under treatment for any injuries from the accident.

Prior to the accident, Fay worked full-time at the Lucas County Jail evaluating inmates for placement (Ex. A, pp. 16-17). She holds the same job today and continues to work full-time (*id.* at pp. 20-21).

Following the accident, Dr. McAlear gave Fay an off-work slip until February 28, 2005 (Ex. 5). On March 8, 2005, Dr. McAlear gave Fay a slip permitting her to return to work on March 9, 2005 (*id.*). At that time, Fay resumed working but was restricted to desk work (Ex. A, pp. 94-95). Dr. McAlear also gave Fay an off-work slip for the week of June 19, 2005 and an off-work slip for the single day of August 4, 2005 (Ex. 5).

Fay paid her sister $210 per week to serve as her caregiver for 21 weeks following the accident (Ex. A, p. 90). Fay said this measure was necessary because she could not drive, take care of her son, clean her house, or shop for groceries for roughly five months following the accident.

**Dorothy Willis**

Dorothy was 67 years old at the time of the accident. She suffered from some ailments prior to the collision. A prior accident caused severe pain in her legs and limited her ability to walk (Ex. B, pp. 20, 56-57). Dorothy also experienced occasional migraines and neck pain (*id.* at pp. 23-26).

At the emergency room immediately after the accident, Dorothy complained of pain in her right shoulder and legs (*id.* at p. 40). X-rays were negative for fractured bones (*id.* at p. 41).

3

The day after the accident, Dorothy followed up with her personal physician, Dr. Rohrs. Dr. Rohrs noted Dorothy had a swollen jaw, a tender neck, a tender back, and a contusion on her left ankle (Ex. 12, p. 1). He also noted she had "very bad" arthritis in her neck (*id.*). Further testing revealed cervical spondylosis[1] between some of her vertebrae (*id.* at p. 6). She returned to Dr. Rohrs for follow-up visits, complaining of neck and back pain. Dr. Rohrs eventually ordered steroid injections as treatment (*id.* at p. 3).

Over the next several months Dorothy made a number of emergency room visits. On February 14, February 16, and March 13, 2005, Dorothy went to Toledo Hospital for emergency room treatments for pain in her back, neck, and right shoulder (Ex. 13). On February 27, 2005, Dorothy went to St. Charles Mercy Hospital for emergency room treatment for pain in her back, ankle, and headaches (Ex. 14). On June 7, 2005, Dorothy went to St. Anne Mercy Hospital for emergency room treatment for pain in her legs (*id.*).

Notably, the February 14, 2005 emergency room report from Toledo Hospital states that "[Dorothy] also has a known history of degenerative changes in her spine and says that she was told that most of her chronic pain is from her degenerative changes" (Ex. 13, p. 1). The report also noted that her past medical history shows significant sciatic nerve pain (*id.*). All the x-rays taken after the accident were negative, with the "exception of her C spine x-ray which showed chronic degenerative changes with the possibility of an acute abnormality at around C6 and C7. Because of this, [the physician] ordered a CT of her C spine which was read as showing only degenerative changes" (*id.* at p. 2).

---

[1]

Spondylosis is defined as "ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary (28th ed. 2000).

4

Dorothy does not have any scars as a result of the accident, nor is she taking any prescribed medication for injuries sustained during the accident.  She did not undergo any physical therapy or surgery to address injuries sustained in the accident.

Dorothy was unemployed prior to the accident and remained so after the accident.  She continues to live with her daughter, as she did prior to the accident.  She also continues to attend church, family, and other social functions.

**Terrell Willis**

Terrell was 6 years old at the time of the accident.  Terrell was taken to the same emergency room in Monroe as his mother and grandmother.  The attending physician noted a "superficial scrape right under his right eye" (Ex. 20).

Emergency room physicians removed glass from his forehead and other areas of his body (Ex. C, p. 16).  Terrell also reports he had a black eye (*id.*).  A cut on his forehead left Terrell with a small scar (Exs. 8, 9, & 21).  Fay took Terrell to a plastic surgeon in November 2008, and the plastic surgeon said the scar could be corrected or minimized with plastic surgery when Terrell is older (Ex. 21).

**ANALYSIS**

**Summary Judgment Standard**

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id*. When considering a motion for summary judgment, the court must draw all inferences from the record in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The Court is not permitted to weigh the evidence or

5

determine the truth of any matter in dispute; rather, the court determines only whether the case

contains sufficient evidence from which a jury could reasonably find for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

**Michigan No-Fault Insurance Statute**

Michigan adopted a no-fault automobile insurance statute.  The Michigan Supreme Court

described the statute's genesis:

> Before 1973, actions seeking damages for injuries resulting from motor vehicle
> related accidents proceeded, for the most part, pursuant to common-law accident
> principles in Michigan's courts.  However, with the enactment of the no-fault act,
> 1972 PA 294, effective October 1, 1973, the Legislature abolished tort liability
> generally in motor vehicle accident cases and replaced it with a regime that established
> that a person injured in such an accident is entitled to certain economic compensation
> from his own insurance company regardless of fault.  Similarly, the injured person's
> insurance company is responsible for all expenses incurred for medical care, recovery,
> and rehabilitation as long as the service, product, or accommodation is reasonably
> necessary and the charge is reasonable.  M.C.L. § 500.3107(1)(a).  There is no
> monetary limit on such expenses, and this entitlement can last for the person's
> lifetime. An injured person is also entitled to recover from his own insurance company
> up to three years of earnings loss, i.e., loss of income from work that the person would
> have performed if he had not been injured.  M.C.L. § 500.3107(1)(b).  An injured
> person can also recover from his own insurance company up to twenty dollars a day
> for up to three years in "replacement" expenses, i.e., expenses reasonably incurred in
> obtaining ordinary and necessary services that the injured person would otherwise
> have performed.  M.C.L. § 500.3107(1)(c).
>
> In exchange for the payment of these no-fault economic loss benefits from
> one's own insurance company, the Legislature limited an injured person's ability to
> sue a negligent operator or owner of a motor vehicle for bodily injuries.  In particular,
> the Legislature significantly limited the injured person's ability to sue a third party for
> noneconomic damages, e.g., pain and suffering.  No tort suit against a third party for
> noneconomic damages is permitted unless the injured person "has suffered death,
> serious impairment of body function, or permanent serious disfigurement."  M.C.L.
> § 500.3135(1).

*Kreiner v. Fischer*, 471 Mich. 109, 114-15 (2004).  Thus, in order to recover from Defendant in tort

law each Plaintiff must establish that any one of three things occurred as a result of the February 2005

6

accident: (1) Plaintiff(s) died; (2) Plaintiff(s) suffered "serious impairment of body function"; or (3) Plaintiff(s) suffered a "permanent serious disfigurement."

The first option is not at issue here.  The second two are.  Each will be examined in turn.

**"Serious Impairment of Body Function"**

Both Fay and Dorothy Willis maintain their respective injuries constitute a "serious impairment of body function."[2]

The no-fault statute, M.C.L. § 500.3135(7), defines "serious impairment of body function" as "an objectively manifested impairment of an important body function that affects the person's general ability to lead his or her normal life."  In *Kreiner*, the Supreme Court established a three-step framework for courts to use to determine whether a plaintiff's injury meets the statutory threshold.

First, a court must ask whether it is proper for it or a jury to compare the plaintiff's injury to the statutory threshold.  To answer this question, the court must determine if there is a genuine factual dispute as to the nature of the plaintiff's injury; or if there is a factual dispute, that it is not material to the determination as to whether the person suffered a serious impairment of body function. *Kreiner*, 471 Mich. at 131-32.  If there is a factual dispute as to the nature of the plaintiff's injury that is material to the outcome of the legal conclusion, the court must preserve the factfinding for the jury. Otherwise, the court may move on to the second step identified in *Kreiner*.

Second, if a court can decide the issue as a matter of law, it must determine if an "important body function" of the plaintiff has been impaired.  *Id.* at 132.  In doing so, the court must determine

---

[2] Plaintiffs have offered no evidence or legitimate argument Terrell's injuries constitute a "serious impairment of body function."  Therefore the Court will not analyze his injuries under this no-fault exception.

7

"if the impairment is objectively manifested. Subjective complaints that are not medically documented are insufficient." *Id.*

Third, the court must determine if the impairment affects the plaintiff's general ability to lead his or her normal life. *Kreiner* instructs courts to engage in "a multifaceted inquiry, comparing the plaintiff's life before and after the accident, as well as the significance of any affected aspects on the course of the plaintiff's overall life." *Id.* However "[m]erely '*any* effect' on the plaintiff's life is insufficient because a de minimis effect would not, as objectively viewed, affect the plaintiff's 'general ability' to lead his life." *Id.* at 133. The *Kreiner* court provided a non-exhaustive list of facts for courts to use when evaluating the plaintiff's general ability to lead a normal life: (a) the nature and extent of the impairment, (b) the type and length of treatment required, (c) the duration of the impairment, (d) the extent of any residual impairment, and (e) the prognosis for eventual recovery. *Id.* at 133. The court also noted that "[s]elf-imposed restrictions, as opposed to physician-imposed restrictions, based on real or perceived pain do not establish [evidence of residual impairment]." *Id.* at 134, n.17.

Pursuant to the first step in *Kreiner*, Plaintiffs contend a factual dispute exists here. The Court disagrees. The nature of the injuries are not in dispute. All parties are relying on the same medical reports and documents. *See Hodge v. Eddy*, 2007 WL 4322260, *1 at n. 1 (Mich. App. Dec. 11, 2007). The dispute between the parties goes to the legal conclusion that is to be drawn from the nature of the Plaintiffs' injuries. Therefore, it is appropriate for this Court to consider the injuries at summary judgment.

The Court finds both Fay and Dorothy have failed to offer sufficient **objective** evidence that their injuries impaired an "important body function." At best, they have offered objective evidence

8

that each suffered bruising and minor injuries.  However, it is "insufficient if an important body function has been injured but not impaired." *Kreiner*, 471 Mich. at 132.

X-rays of Fay taken at the emergency room immediately after the accident were negative.  X-rays conducted in Toledo days later were also negative.  Fay's subjective complaints of pain are not objective evidence.  In short, Fay failed to produce any objective evidence that an important body function was impaired.  The only concrete injuries caused by the accident detected by physicians were bruising on Fay's scalp, and sprains to her neck and right ankle.

Likewise, x-rays of Dorothy have consistently returned negative results.  She suffered from arthritis in her neck and back prior to the accident and continues to do so today.  She has not offered objective medical evidence of an impairment caused by the accident; at best she has shown aggravation of pre-existing arthritis.

Furthermore, the Court finds both Fay and Dorothy's injuries did not affect their general ability to lead a normal life.  Certainly each woman was inconvenienced for a period of time after the accident, as they healed from their bruises, but that is not enough to recover under the statute.

Fay was off work for a few weeks and used crutches for a period of time, but as the *Kreiner* court noted, a "de minimis effect would not, as objectively viewed, affect the plaintiff's 'general ability' to lead his life." *Kreiner*, 471 Mich. at 133.  The *Kreiner* factors support a finding that Fay's general ability to lead a normal life was not impeded.  She did not receive physical therapy and did not need any surgery.  She resumed working full-time the month after the accident.  Fay claims her injuries required her sister to serve as her caregiver for more than five months after the accident, but the Court finds no objective evidence of a medical necessity for this service.  "[S]elf-imposed

restrictions, based on real or perceived pain do not establish [evidence of residual impairment]." *Id.* at 134, n.17.  She resumed all her normal family and social activities shortly after the accident.

Dorothy suffered from chronic degenerative leg, neck, and back pain which limited her activity prior to the accident.  She appears to lead a similar quality of life post-accident.  She continues to live with her daughter and attend social and family functions.  She too offers no objective evidence that this accident impaired an important body function that affected her general abilities.

### "Permanent Serious Disfigurement"

Next the Court turns to the question of whether Terrell Willis suffered a "permanent serious disfigurement."  Determining the "seriousness" of a scar is a matter of common knowledge and experience in view of objective standards for the courts, unless there is a question regarding the nature and extent of the plaintiff's scar.  M.C.L. § 500.3135(2)(a); *Nelson v. Myers*, 146 Mich. App. 444, 446 (1985).

Whether a scar is a permanent serious disfigurement "depends on its physical characteristics rather than its effect on the plaintiff's ability to lead a normal life." *Kosack v. Moore*, 144 Mich. App. 485, 491 (1985).  A "hardly discernable scar does not meet the statutory threshold." *Id.*

In *Petaja v. Guck*, 178 Mich. App. 577 (1989), plaintiff sought recovery for non-economic damages under Michigan's no-fault laws for permanent serious disfigurement.  The court held that plaintiff's "small, hardly discernible tissue scar immediately below [his] lip" failed to meet the threshold requirement.  *Id.* at 579-80.

In *Buys v. Cooper*, No. 06-044359, 2007 WL 1556128 (Mich App. May 24, 2007), plaintiff suffered a broken ankle after the car she was riding in was struck by the defendant.  Plaintiff

underwent surgery and doctors inserted pins and a plate in her ankle for stability.  The court held the surgical scar did not meet the requisite seriousness under the no-fault statute.

Finally, the court in *Kanaziz v. Rounds*, 153 Mich. App. 180, 186 (1986), found that a one-inch laceration scar on the eyelid, which was not readily noticeable, did not constitute a "permanent serious disfigurement."

The Court assumes for the purposes of summary judgment that Terrell's scar is a disfigurement and is permanent.  The Court, however, finds the scar is not "serious" as required by M.C.L. § 500.3135(2)(a).  Terrell did not require any stitches and the scar is quite small and not readily noticeable, as indicated by the photographs submitted by Plaintiffs (Exs. 8, 9 & 21).  His minor scarring is similar to the situations described in the above cases where the courts also concluded that those plaintiffs, who also suffered scars, did not meet the statutory threshold.

### Conclusion

All three Plaintiffs failed to establish they suffered "serious" injuries enabling them to recover under Michigan's no-fault insurance laws.  Therefore, Defendant Wallace's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

    *s/ Jack Zouhary*    
JACK ZOUHARY
U. S. DISTRICT JUDGE

February 5, 2009

11